IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| Lawrence LaRoche, III<br>and Parker LaRoche<br><br>                Plaintiffs,<br>v.<br><br>Christopher Chapman, et. al.<br><br>                Defendants. | )<br>)<br>)   Civil Action No.: 2:19-cv-118<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT
AGAINST ALL DEFENDANTS ON LIABILITY**

COME NOW Plaintiffs Lawrence LaRoche, III and Parker LaRoche, by and through their attorney, E. Michael Ruberti, Esq., and in support of their Motion for Summary Judgment Against All Defendants On Liability ("Plaintiffs' Motion"), submit the following:

**I. STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE EXISTS NO
GENUINE DISPUTE TO BE TRIED
A.**

On Wednesday, January 24, 2018, at about 10 p.m., plaintiffs Larry LaRoche ("Larry") and Parker LaRoche ("Parker") were asleep in their home at 1023 River Dance Loop ("1023 RDL"), in Townsend, Georgia. Defendants, outfitted in SWAT gear, without a search or arrest warrant, without knocking or otherwise requesting permission to enter, burst into plaintiffs' home. Defendants' manner of entry and subsequent actions terrified Larry and Parker. PSOF ¶¶ 1-3, 7, 8.[1]

---

[1] "PSOF" refers to Plaintiffs' Statement of Material Facts As To Which Plaintiffs Contend There Exists No Genuine Dispute And Conclusions of Law submitted herewith.

1

There are five witnesses to the time of defendants' actions. They are Larry, Parker, Larry's son Lawrence LaRoche IV ("Chance"), Barbara Thomas ("Thomas"), and Rachel Smith ("Smith"). Chance, Thomas, and Smith place the time of the SWAT team's raid on 1023 RDL as beginning at approximately 10:00 to 10:15 p.m. on January 24, and ending between 11:00 and 11:30 p.m. that same night. PSOF ¶¶ 4-6; 8-11.

Larry deposed that he was not sure of the time the raid began because he was asleep, but "guesstimated" that it began about 12:00 a.m. on January 25. Parker also deposed that he was not sure of the time the raid began because he was asleep, but "guesstimated" that it began about 1:00 a.m. on January 25. PSOF ¶¶ 8-10.

Throughout defendants' raid, (i) Larry and Parker were located within their home at 1023 RDL; (ii) Chance was outside on the front porch, where he had been handcuffed and exposed to the bitter cold after being arrested by defendants; (iii) Thomas was in her mobile home watching the SWAT raid, which included the arrest and handcuffing of Chance, unfold from about 75 feet away; and (iv) Smith was babysitting in Trailer A-3 in the nearby Buccaneer Trailer Park (A-3). PSOF ¶¶ 22.

While they were inside 1023 RDL, defendants seized and terrified Larry and Parker, and conducted an extensive, intrusive, destructive search of their home. On several occasions, plaintiffs asked defendants to show them a warrant. Defendants, having no warrant, did not produce one. Defendants, despite rummaging through all of plaintiffs' belongings and ransacking plaintiffs' home, found no evidence of a crime. They left without arresting either plaintiff or seizing any of either's property. PSOF ¶¶ 7, 8, 12-16.

Defendants Michael Melton ("Melton") and Karone Robinson ("Robinson") were at plaintiffs' home from the beginning to the end of the raid at 1023 RDL. They, along with the

remainder of the raiding party, went directly to A-3, where Ms. Smith was babysitting, after leaving plaintiffs' home. Upon their arrival at A-3, Robinson pounded on Smith's door, loudly informed her that it was the police, and demanded entry. Frightened, Smith granted Robinson and several other defendants' entry. Robinson and these other defendants entered A-3 between 11:00 and 11:30 p.m., and remained there for about an hour. Melton remained outside A-3 while defendant Robinson and several other SWAT team members were inside. PSOF ¶¶ 23-27.

Defendants defend their actions as being authorized by a no knock search warrant for 1023 RDL[2] signed by McIntosh County Magistrate James B. Smith, at ***1:00*** a.m. on January 25. Melton obtained the search warrant. Robinson, who was in charge of the operation, was present when he did so. Melton and Robinson knew that without a search warrant, his and the remainder of the SWAT team's actions were unlawful. PSOF ¶¶ 17-21.

The Return of Service of the search warrant, signed by Robinson, is consistent with Larry's, Chance's, Thomas' and Smith's testimony showing that defendants' raid on 1023 RDL began ***prior to 1:00 a.m.*** on January 25. It states: "***I executed this search warrant on the 25, 2018 at 0030,***" i.e., at 12:30 a.m. on January 25, 2018, ***thirty minutes before the magistrate signed the warrant.*** The Return of Service also states that, "A copy of the warrant was left with home ownes (sic)." Because the search warrant had not yet been signed by the magistrate, it was not "left with the homeowner." PSOF ¶¶ 17-21; 28-30.

Thus, Melton and Robinson obtained the search warrant (i) ***after*** the SWAT team's search, seizure of plaintiffs, and ransacking of 1023 RDL had terrorized plaintiffs from about 10:00 to 11:00 p.m. on January 24; (ii) ***after*** their similar actions at A-3 from about 11:00 p.m. to 12:00 a.m. on January 24 and 25; and (iii) by ***purposefully omitting the fact that the raid on***

---

[2] Larry and Parker lived at 1023 RDL, not 1028. The warrant's references to "1028" RDL in Melton's affidavit, being immaterial herein, are corrected to "1023" RDL.

3

*__1023 RDL had already occurred.__*  Robinson, who was present when Melton presented his affidavit in support of the search warrant to the magistrate, and who was the officer in charge of the "operation," knew that Melton had secured the warrant by omitting the fact that their search and seizure of plaintiffs and their home had occurred prior to Melton obtaining the warrant. PSOF ¶¶ 17-21; 28-30.

### B.

The "basis for believing" section of Melton's affidavit supporting his request for the warrant, consisting of two paragraphs, states:[3]

> (1) On January 24, 2018 at approximately 8:30 PM an operation was initiated to purchase controlled substances and a Firearm from Roger Blauvelt at Buccaneer Trailer Park trailer A3 Crescent GA. 31304. (2) The Confidential Informant and Mr. Blauvelt left Buccaneer Trailer Park trailer A3 and went to Lawrence LaRoche IV (AKA Chance) located at 1023 River Dance Loop Crescent GA. 31304. (3) The Confidential informant handed Lawrence LaRoche IV $490.00 in authorized government funds and purchased an amount of suspected Methamphetamine and a Glock 21 45 caliber. (4) Captain Steve Hutchison and Sgt. Michael L. Melton met the confidential informant at a predetermined location where Sgt. Michael L. Melton retrieved the evidence purchased from the confidential informant.

> (1) The C.I. was given one $500.00 (in which the confidential informant only spent $490.00) from authorized government funds to purchase the controlled substance and the firearm. (2) The C.I. left the predetermined location and went to the address of Buccaneer Trailer Park trailer A3 Crescent GA 31304 to meet with Mr. Roger Blauvelt. (3) The C.I. was under constant surveillance including all but not limited to audio and/or video recording on the C.I. to Buccaneer Trailer Park trailer A3 Crescent GA. (4) The C.I. was seen going to the residence to purchase illegal narcotics and a firearm. (5) We observed the C.I. leave the residence. (6) When the C.I. left Buccaneer Trailer Park trailer A3 Crescent Ga 31304 and went to 1023 River Dance Loop constant surveillance was conducted on the C.I. to 1023 River Dance Loop. Exh. A to PSOF, pp. 20-21.

### II. ARGUMENT AND CITATION TO AUTHORITY

The Fourth Amendment provides:

---

[3] Each of the sentences of the two paragraphs has been numbered to facilitate the analysis of this section.

4

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

1. <u>Plaintiffs should be granted summary judgment holding that defendants' actions at 1023 RDL constituted an unreasonable search and seizure because they were taken without a search warrant.</u> The search and seizure of plaintiffs' and their home in the circumstances presented violated the Fourth Amendment. The language of the Fourth Amendment and the case law could not be clearer. Warrantless searches and seizures such as the one herein violate the Fourth Amendment because they do not fall within any of the "carefully drawn exceptions to the warrant requirement" crafted by the Supreme Court in *Arkansas v Sanders*, 442 U.S. 753, 759 (1979). Moreover, both Melton and Robinson knew that law enforcement officers were constitutionally prohibited from taking the actions that they did at 1023 RDL without a search warrant. That is why they rely on their false, conspiratorial claim that Melton had obtained a search warrant prior to their search, seizure and terrorizing of plaintiffs.

The Fourth Amendment requires a truthful factual showing in the affidavit used to establish probable cause. *Franks v. Delaware,* 438 U.S. 154, 165-66 (1978). Because the Fourth Amendment prohibits an officer from making perjurious or recklessly false statements in support of a warrant, "the obvious assumption is that there will be a truthful showing." *Franks* at 164-65, *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994).

Since *Franks v. Delaware*, 438 U.S. 154 (1978), it has been clearly established that a defendant's Fourth Amendment rights are violated if (i) the affiant, in support of the search warrant, includes "a false statement knowingly and intentionally, or with reckless disregard for the truth;" and (ii) "the allegedly false statement is necessary to the finding of probable cause." Id. at 155-56. In *Kelly v. Curtis*, 21 F.3d at 1554, the Eleventh Circuit specifically included

5

perjurious or recklessly false **_omissions_** within the scope of *Franks*. In *Franks*, at 165, the Supreme Court observed that the warrant requirement is meant, "to allow the magistrate to make an independent evaluation of the matter." Herein, Melton, with Robinson present, (i) "knowingly and intentionally;" (ii) omitted the fact that the **_raid on 1023 RDL had already occurred_**, a fact that would have prevented the magistrate from lawfully signing the warrant. Thus, Melton and Robinson "violated a clearly established duty not to seek a warrant on the basis of perjured testimony." *Kelly v. Curtis* at 1554.

There is no genuine issue of fact for trial. Larry and Parker, in their complaint herein, long before they had any reason to believe that Melton and Robinson would claim that they had obtained a warrant at 1:00 a.m. on January 25, alleged that the time of the raid on their home was between 10:00 p.m. on January 24 and 12:00 a.m. on January 25. Complaint ¶¶ 7-11. In fact, they correctly believed that defendants did not have a warrant. Id. ¶ 69.

Larry, being asleep and terrified when the raid began, is unsure of when it began. He "guesstimates" that it began at about midnight on January 24, well before 1:00 a.m. on January 25. Parker, like Larry, being asleep and terrified when the raid began, is also unsure of when it began. He "guesstimates" that it began at about 1:00 a.m., the time at which the magistrate signed the warrant.

The three witnesses who were awake at the time of the raids on 1023 RDL and A-3, Chance, Thomas and Smith, were in a better position than Larry and Parker, who were asleep and then terrorized by the raiders, to establish the time the raid on 1023 RDL began. Again, the trio places the beginning of the raid at about 10:00 to 10:15 p.m., ending between 11:00 and 11:30 p.m. Neither Thomas nor Smith had any reason to lie about the time the raid began. It is obvious that Chance did not lie about the time the raid began because Thomas and Smith

corroborate his testimony. Melton and Robinson, however, had every reason to lie to the magistrate, because they knew they had unlawfully searched, seized and terrorized Larry and Parker. Robinson's Return of Service stating that the warrant was executed at 12:30 a.m., a time **prior** to its being signed by the magistrate at 1:00 a.m., proves his and Melton's lie.

"At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no such issue [when] there is sufficient evidence favoring [a party] for a jury to return a verdict for that party. In essence, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law." The evidence that Milton and Robinson obtained the warrant *after* defendants' unlawful actions at 1023 RDL "is so one-sided" that plaintiffs "must prevail [on that issue] as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S., 242, 243 (1986). Thus, plaintiffs should be granted summary judgment holding that Melton and Robinson obtained the search warrant by deceiving the magistrate into believing that their raid on 1023 RDL, which was in the past, was an action that would take place in the future.

2. Plaintiffs should also be granted summary judgment holding that Melton's supporting affidavit failed to establish probable cause. The Fourth Amendment requires affiants to "set forth particular facts and circumstances underlying the existence of probable cause," including those that concern the **reliability of the information and the credibility of its source**. *Franks v. Delaware* 438 U.S. at 165.

In *Garmon v. Lumpkin County*, 878 F.2d 1406, 1408-10 (11th Cir. 1989), an officer sought a warrant to arrest Garmon based on an affidavit stating that Garmon "did … commit the offense of false report of a crime." The court held that the officer had violated the Fourth

7

Amendment by seeking the warrant, because "[s]uch a conclusory affidavit clearly is insufficient to establish probable cause. ... The affidavit contains neither information providing the basis for the affiant's belief nor any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime." *Id.* at 1409-10.

Melton did not have personal knowledge of the "circumstances surrounding the alleged commission of a crime." The information to which Melton swore was given to him by Robinson, which in turn was given to Robinson by a purported confidential informer. Robinson, not Melton, was in charge of the SWAT team and its "operation". PSOF ¶ 21. Melton's affidavit falls woefully short of satisfying the firmly established constitutional standards identified in *Garmon*. That part of Melton's affidavit setting forth his "basis for believing" that there existed probable cause to search 1023 RDL and seize Larry and Parker and any evidence of criminal activity therein does not establish probable cause, as follows.

### A.

### First Paragraph

(1) The first sentence of the first paragraph of Melton's "basis" section refers to "an operation ... to purchase controlled substances and a Firearm from Roger Blauvelt ("Blauvelt") at Buccaneer Trailer Park, trailer A-3..." This first sentence does not implicate Larry, Parker or 1023 RDL as being subjects of the "operation." Nor does it contain an "affirmative allegation that [Melton] had the required personal knowledge. See, e.g., *Garmon v. Lumpkin County*, 878 F.2d at 1409-10.

(2) Melton's second sentence states that the "Confidential Informant and Mr. Blauvelt left ... A-3 and went to ... [Chance] located at 1023 RDL." The second sentence contains no connection between an "operation" directed at Blauvelt and this purported visit to Chance

8

"located at" 1023 RDL.  The second sentence does not state that the purported confidential informant ("CI") and Blauvelt were under surveillance by Melton or any other law enforcement personnel when they allegedly "went to … Chance … located at 1023 RDL."  Nor does it state that the CI reported this alleged information back to Melton.  Nor does it explain how or why Blauvelt, the target of the "operation at A-3", came to accompany the purported CI to 1023 RDL to meet with Chance.  Thus the second sentence contains no evidence that the purported CI communicated any of this alleged information to Melton, meaning that Melton presented no personal knowledge of these allegations to the magistrate.  The second sentence relies entirely on three unarticulated allegations for which no evidence is presented: (i) that the purported CI provided the information alleged therein to Melton; (ii) that the information provided by the purported CI was reliable; and (iii) that the purported CI was credible.  As noted throughout this parsing of Melton's affidavit, this sentence contains no – zero – evidence even attempting to show that the information presented to the magistrate was reliable, or that the purported CI was credible, let alone both.  ("The *Franks* reliability/credibility test").

(3)  Melton's third sentence states that Chance sold some drugs and a gun to the purported CI.  The third sentence does not state where the alleged sale took place.  More specifically, the third sentence does not state that the sale took place outside of or inside of 1023 RDL, or even if it took place on the property.  Again, there is no allegation of personal knowledge. Moreover, the third sentence, like the second, fails the *Franks* reliability/credibility test.

(4)  The fourth sentence states that Melton and another officer "retrieved the evidence purchased from the confidential informant."  The fourth sentence contradicts the third sentence because the third sentence states that the purported CI was the purchaser and that Chance was the

9

seller, whereas the fourth sentence states that the purported CI was the purchaser. The fourth sentence, like the second and third, fails the *Franks* reliability/credibility test.

## B.

### Second Paragraph

(1) The first sentence of Melton's second "basis" paragraph states that the purported CI "purchased the controlled substance and the firearm," but does state who was the seller. Nor does the first sentence state where the alleged purchase and sale took place. Thus the first sentence does not implicate Larry, Parker, Chance or 1023 RDL. This sentence also fails the *Franks* reliability/credibility test.

(2) Melton's second sentence alleges that the CI left the meeting with him and another officer and went to A-3 to meet Blauvelt. Thus, the second sentence does not implicate Larry, Parker, Chance or 1023 RDL. This sentence also fails the *Franks* reliability/credibility test.

(3) Melton's third sentence alleges that the CI was "under constant surveillance" as s/he left the meeting with Melton and the other officer until s/he reached A-3. Thus, the third sentence does not implicate Larry, Parker, Chance or 1023 RDL. This sentence also fails the *Franks* reliability/credibility test.

(4) Melton's fourth sentence alleges that the purported CI remained under law enforcement surveillance as s/he went into A-3 "to purchase illegal narcotics and a firearm." Once again, nothing in this sentence implicates Larry, Parker, Chance or 1023 RDL. Moreover, the third and fourth sentences make no sense because, according to the first paragraph of Melton's "basis" section, the purported CI had already delivered the drugs and the gun s/he had allegedly purchased from Chance to Melton and the other officer. This sentence also fails the *Franks* reliability/credibility test.

(5) (6) The fifth and sixth sentences state that the purported CI returned to 1023 RDL under law enforcement surveillance. The fifth and sixth sentences make no sense for several reasons: (a) no explanation for the purported CI to return to 1023 RDL is stated; (b) no action taken by the purported CI upon his/her return to 1023 RDL is stated; (c) the alleged purchase and sale had occurred on the purported CI's alleged first trip to 1023 RDL (see first paragraph, subparagraphs (3) and (4)); and (d) only one purchase and sale is alleged in Melton's two paragraph "basis" section. Finally, assuming *arguendo* some sense can be made of these two sentences, they fail the *Franks* reliability/credibility test. Thus, plaintiffs should be granted summary judgment holding that Melton's affidavit in support of the warrant failed to allege particular facts and circumstances necessary to establish probable cause.

  3. <u>Plaintiffs anticipate that defendants will claim qualified immunity. Plaintiffs should be granted summary judgment holding that defendants are not entitled to qualified immunity (i) because Melton and Robinson deliberately omitted from Melton's supporting affidavit and withheld from the magistrate the fact that the search and seizure authorized by the warrant had occurred in the past; and/or (ii) because Melton and Robinson failed to allege in Melton's supporting affidavit the particular facts and circumstances underlying the purported existence of probable cause and Melton, the affiant, lacked personal knowledge of the allegations to which he attested.</u> Qualified immunity is unavailable herein. When a law enforcement officer is sued under § 1983, the officer is entitled to claim qualified immunity, which is immunity from suit rather than a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity, when granted, entitles an officer not to stand trial. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine protects all but the plainly incompetent and those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Law enforcement officers are entitled to

qualified immunity where their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In deciding whether to grant an officer qualified immunity under § 1983, courts use a two-part analysis. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, the court must determine whether a constitutional violation occurred; if no violation has occurred, that ends the inquiry. *Saucier*, 533 U.S. at 201. If a constitutional violation can be established, the court must then decide whether the right was *clearly established* at the time of the violation. *Id.* In addressing what is meant by the term *clearly established*, the Supreme Court has stated:

> "Clearly established" for purposes of qualified immunity means that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent. *Wilson v. Layne*, 526 U.S. at 614-15.

A right is *clearly established* for qualified immunity purposes where the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state in which the action arose. *Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir. 1998). In *Kelly v. Curtis*, 21 F.3d 1544, 1533 (11th Cir. 1994), the court noted that the "Supreme Court has held that qualified immunity does not protect an officer who seeks a warrant where a reasonably well-trained officer … would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant," citing *Malley v. Briggs*, 475 U.S. 335, 345 (1986), and that "the Supreme Court has also held that the Constitution prohibits an officer from making perjurious or recklessly false statements in support of a warrant," *citing Franks v. Delaware*, 438 U.S. at 156, 165-71 (1978). The *Kelly* court, at 1553, further held that the *Franks* rule regarding perjurious and recklessly false statements applies to ***omissions*** made

by a police officer in support of a warrant. Moreover, "it would be an unthinkable imposition upon [a magistrate's] authority if a warrant affidavit ... contained[ed] a deliberately ... false statement, [and be allowed] to stand beyond impeachment." *Franks* at 165; see *Kelly* at 1555; see *Garmon v. Lumpkin County*, 878 F2 at 1411.

Moreover, where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission is intended to enhance the contents of the affidavit as support for a conclusion of probable cause, the shield of qualified immunity is lost. See *Malley v. Briggs*, 475 U.S. at 344-45 (adopting the standard set forth in *United States v. Leon*, 468 U.S. 897, 923 (1984), as the proper standard for objective reasonableness for qualified immunity purposes). An officer can "have no reasonable grounds for believing that [a] warrant was properly issued" "[i]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon*, 468 U.S. at 923.

<u>Omission.</u> Plaintiffs have proven their "omission" claim for purposes of defeating defendants' anticipated qualified immunity defense. Plaintiffs have proven that (i) defendants' warrantless search and Melton's subsequent securing of the warrant based on his and Robinson's perjured testimony constituted a constitutional violation; and (ii) the right of plaintiffs to be free from such perjured testimony was clearly established. See, pp. 4-7, 11-13 hereinabove.

<u>Probable Cause.</u> Plaintiffs have also proven their claim that the warrant was facially insufficient to establish probable cause. See pp. 7-13 hereinabove. Moreover, in *Malley v. Briggs*, 475 U.S. at 344-45, the Supreme Court held that qualified immunity does not protect an

13

officer who seeks a warrant on the basis of an affidavit that does not show reasonably objective probable cause … even if the magistrate erroneously issues the warrant.

### III. CONCLUSION

Plaintiffs Larry LaRoche and Parker LaRoche should be granted summary judgment holding that defendants are liable for violating their Fourth Amendment rights, and the case should be submitted to a jury to decide their damages.

Respectfully submitted this the 9th day of November, 2020.

E. MICHAEL RUBERTI, ESQ., LLC

By: /s/E. Michael Ruberti
E. Michael Ruberti
Post Office Box 20649
St. Simons Island, Georgia 31522
Telephone: (912) 634-2130
Facsimile: (912) 634-3783
Email: emr@rubertilaw.com
Georgia Bar No.: 618343

### CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

This 9th day of November, 2020.

E. MICHAEL RUBERTI, ESQ., LLC

/s/ E. Michael Ruberti

Georgia Bar No. 618343