# In the United States District Court for the Southern District of Georgia Brunswick Division

LAWRENCE LAROCHE, III and
PARKER LAROCHE,

    Plaintiffs,

    v.

CHRISTOPHER CHAPMAN, et al.,

    Defendants.

No. 2:19-CV-118

## ORDER

Before the Court are cross motions for summary judgment: Plaintiffs' partial Motion for Summary Judgment, dkt. no. 26, and Defendants' Motion for Summary Judgment, dkt. no. 29. For the reasons stated below, both motions are **DENIED.**

## BACKGROUND

This case arises from a search of Plaintiffs' residence by the McIntosh County Sheriff's Department in the late hours of January 24, 2018 or the early hours of January 25, 2018. Dkt. No. 26-2 ¶¶ 1, 2; Dkt. No. 29-2 ¶¶ 1, 10. Plaintiffs Lawrence LaRoche, III ("Larry") and Parker LaRoche ("Parker") are first cousins who were both living in Larry's mobile home at the time of the search. Dkt. No. 26-2 ¶¶ 1; Dkt. No. 29-5 at 19. Larry's son, Lawrence LaRoche, IV ("Chance"), lived in Trailer A-3 in the Buccaneer

Trailer Park, which is about a mile from Plaintiffs' residence, at the time of the search. Dkt. No. 26-5 ¶¶ 1, 2; Dkt. No. 29-2 ¶ 4. The address of Plaintiffs' residence is unclear: it is either 1023 or 1028 River Dance Loop, in either Townsend, Georgia or Crescent, Georgia. Compare, e.g., Dkt. No. 26-2 ¶ 1 (Plaintiffs' Statement of Facts describing the address as 1023 River Dance Loop in Townsend, Georgia) with Dkt. No. 26-4 at 18-22 (search warrant and corresponding affidavit describing the address as 1028 River Dance Loop in Crescent, Georgia). The residence is undisputedly located in McIntosh County, Georgia. Dkt. No. 26-2 ¶ 1.

Defendants are law enforcement officers with the McIntosh County Sheriff's Department. Dkt. No. 1 ¶ 6; cf. Dkt. No. 8 at 4 (Defendants denying Plaintiffs' statement to this effect "as worded"); but see Dkt. No. 29-2 at 3 (Defendants arguing that they are protected by qualified and official immunity as "officers"). Defendant Karone Robinson ("Deputy Robinson") was in charge of the search at Plaintiffs' residence, and Defendant Michael Melton ("Deputy Melton") wrote the search warrant at issue. Dkt. No. 26-2 ¶¶ 18, 20; Dkt. No. 57 ¶ 18. Along with Deputies Robinson and Melton, the other Defendants were present during the search of Plaintiffs' residence. See Dkt. No. 57 ¶ 4 (referring to "Defendants' entry into . . . the residence").

##### I.  Defendants' Timeline

Defendants claim to have performed a controlled buy with a confidential informant (the "CI") prior to the search of Plaintiffs' residence.[1]  See Dkt. No. 29-2 ¶¶ 1-6.  According to Defendants, Deputy Robinson arranged for the CI to purchase drugs and a firearm from an individual named Roger Blauvelt on the evening of January 24, 2018.  Id. ¶ 1; Dkt. No. 57 ¶ 6.  Defendants provide a video/audio exhibit from the controlled buy:  the video is approximately one hour and forty-five minutes long, and Deputy Robinson starts the video by filming his watch (on which the time displayed is mostly illegible) and stating that "it is Wednesday, January 24th, 9:35 hours."  Dkt. No. 38-5; Dkt. No. 38-4 ¶ 7.  The beginning of the video appears to be filmed outdoors, and it appears to be dark outside, supporting Deputy Robinson's contention that "9:35 hours" refers to 9:35 p.m.  Dkt. No. 38-5; Dkt. No. 38-4 ¶ 7.  Defendants contend this video evidences a sequence of events, starting with the CI's meeting with Roger Blauvelt in Trailer A-3 of the Buccaneer Trailer Park; Mr. Blauvelt's telling the CI that drugs and a gun were in a different location; the CI's following Mr. Blauvelt in a separate car down the road to the other location; the CI and Mr. Blauvelt's arriving

---

[1] Plaintiffs argue that the evidence undercuts the existence of any such informant.  Dkt. No. 27-1 at 2.  They also argue the timeline differs in substantial ways from Defendants' timeline, which is why the parties' versions of the facts are set out separately herein.  See infra section I.B.

at Plaintiffs' residence; and at Plaintiffs' residence, Chance LaRoche's taking the CI's money and handing the CI an amount of methamphetamine and a Glock 21 .45 caliber handgun. See Dkt. No. 26-4 at 20-21; Dkt. No. 38-4 ¶¶ 9-10. Defendants contend the video demonstrates that the CI's purchase from Chance LaRoche at Plaintiffs' residence occurred at 10:38 p.m. on January 24, 2018. Dkt. No. 38 at 6. Based on Defendants' contention that the video begins at 9:35 p.m., the one-hour-and-forty-five-minute video ends at approximately 11:20 p.m. See id.; dkt. no. 38-5.

Deputy Robinson attests that he met with the CI after the surveilled purchase, asked Deputy Melton to type an affidavit for a search warrant of Plaintiffs' residence, and then traveled with Deputy Melton to McIntosh County Magistrate Judge Smith's home to obtain the search warrant. Dkt. No. 38-4 ¶¶ 11-13; Dkt. No. 29-4 at 27. Deputy Robinson recounts that he presented the warrant and affidavit along with oral statements under oath to Judge Smith in support of the application, and that Judge Smith signed the search warrant at 1:00 a.m. Dkt. No. 38-4 at ¶¶ 13-14. The subject search warrant reflects a written time next to Judge Smith's signature of 1:00 a.m. on January 25th, 2018. Dkt. No. 26-4 at 24. The warrant contains a "No-Knock Clause," which allows entry to be made without knocking, and an "Other Parties Clause," which allows officers to search any occupants of the residence. Id. at 26-27. The search warrant authorizes the search of a residence

located at "1028 River Dance Loop" in "CRESCENT, GA 31304" for the purpose of seizing, *inter alia*, controlled substances, currency, and firearms.  Id. at 22-24.  The search warrant describes Plaintiffs' residence as a double-wide trailer, but Larry LaRoche describes his home as a single-wide.  Compare Dkt. No. 29-5 at 12 with Dkt. No. 26-4 at 18, 22.  The search warrant further describes "[t]he front of the house [as] fac[ing] River Dance Loop" with "steps going up to the front door."  Dkt. No. 26-4 at 22.

After obtaining the search warrant, Deputies Robinson and Melton briefed the other Defendants on the operation; Defendants then traveled to Plaintiffs' residence to perform the subject search.  Dkt. No. 29-4 at 10.  Defendants contend they arrived at Plaintiffs' residence at approximately 2:00 a.m., immediately encountered Chance LaRoche exiting the residence, and arrested Chance at 2:01 a.m.  See Dkt. No. 29-2 ¶ 9; Dkt. No. 57 ¶ 6; Dkt. No. 26-4 at 12.  Defendants then entered Plaintiffs' residence without knocking and began to perform their search.  Dkt. No. 29-4 at 10.

The actual return of service reflects the time of execution as 12:30 a.m. on January 25, 2018.  Dkt. No. 26-4 at 28.  Deputy Robinson seeks to account for the time discrepancy by explaining that he "inadvertently listed the wrong time for the execution of the search warrant" in this Return of Service "[d]ue to the time that had passed since the search of the residence."  See Dkt. No.

38-4 ¶¶ 16, 18-19.  For reasons unknown to the Court at this time, the return of service was filed on July 30, 2018, which was over six months after the search occurred.  <u>See</u> Dkt. No. 26-4 at 28.

Defendants found Plaintiff Larry LaRoche in one bedroom and Plaintiff Parker LaRoche in another bedroom on the opposite side of the house.  Dkt. No. 29-4 at 10-11.  Defendants handcuffed Plaintiffs and brought them into the living room or the kitchen, where Plaintiffs sat while Defendants searched the residence.  <u>Id.</u> at 11; Dkt. No. 29-6 at 26-27; Dkt. No. 57 ¶¶ 7, 12.  Defendants did not find any relevant evidence during their search of Plaintiffs' residence.  Dkt. No. 26-4 at 9, 28.  Defendants claim that they left a copy of the warrant at the residence, removed Plaintiffs' handcuffs, and told Plaintiffs "they were free and to have a nice day."  <u>Id.</u> at 28; Dkt. No. 57 ¶¶ 7, 30.

Finally, Defendants traveled to Trailer A-3 in the Buccaneer Trailer Park to arrest Roger Blauvelt for the illegal sale of a firearm and narcotics.  Dkt. No. 57 ¶ 27; Dkt. No. 26-4 at 7, 8. Defendants knocked on the trailer's door, told the person who answered (a woman named Rachel Smith) that it was the Sheriff's Office, and then arrested Mr. Blauvelt.  Dkt. No. 26-4 at 7, 8.

## II.  Plaintiffs' Timeline

Plaintiffs' version of the facts differs substantially from Defendants' both in substance and in timing.  Plaintiffs argue that the facts show two main things: first, Defendants' CI may not

have existed at all, and second, Defendants did not obtain the search warrant until *after* they searched Plaintiffs' residence. Dkt. No. 27-1 at 2. Plaintiffs' version of the facts starts at about 10:00 p.m. on January 24, 2018, when they allege Defendants "burst into" Plaintiffs' residence while Plaintiffs were sleeping. Dkt. No. 26-2 ¶¶ 1-2. Barbara Thomas, Larry's neighbor, attests that she saw police vehicles approach Larry's home at about 9:45 p.m.; she estimates the time the police entered Larry's home to be about 10:00 p.m. Dkt. No. 26-6 ¶¶ 3-4, 10-11. Chance LaRoche also testified that he saw police approach Plaintiffs' residence "between 9:45 and 10:15 p.m." Dkt. No. 26-5 ¶¶ 3-5. Larry "guesstimated" that the search began at about 12:00 a.m. on January 25, 2018, and Parker "guesstimated" that the search began at about 1:00 a.m.[2] Dkt. No. 26-2 ¶¶ 9, 10. Chance attests that he was at his father's home doing laundry the evening of January 24, 2018, and he saw police cars arrive between 9:45 and 10:15 a.m. Id. ¶¶ 3-5.

Chance alleges that upon seeing the police, he went outside, walked toward Ms. Thomas's home, and was arrested by two deputies "dressed in SWAT gear" who took him to his father's front porch. Id. ¶¶ 5-9. Larry testified that he was sleeping unclothed and

---

[2] Plaintiffs seek to explain the discrepancy between Plaintiffs' estimates and the testimony of the rest of their witnesses (i.e., Chance, Ms. Thomas, and Ms. Smith, see infra) by asserting that Plaintiffs "were asleep and terrified by defendants' actions" when the search began. Dkt. No. 26-2 ¶ 8.

awakened by the police, that the police handcuffed him and took him to the kitchen without allowing him to put on clothing, and that he sat six to seven feet from the kitchen door that was opened to the outside for approximately an hour while the police searched the house. Dkt. No. 29-5 at 27-30. Parker says he was also awoken by police "screaming and shouting" and sticking lights and weapons "in [his] face," the police handcuffed him and took him to the living room, and he sat on the couch for about two or three hours while the police conducted the search. Dkt. No. 29-7 at 26-29. Plaintiffs claim they both asked Defendants to show them a warrant on several occasions, but Defendants neither gave them a warrant nor left one at the residence. Dkt. No. 26-2 ¶¶ 13-14. After Defendants found no evidence of a crime in Plaintiffs' residence, Defendants removed Plaintiffs' handcuffs and left at approximately 11:30 p.m. Id. ¶¶ 11, 15-16. After the search of Plaintiffs' residence, Defendants then proceeded to Trailer A-3 in the Buccaneer Trailer Park. Id. ¶¶ 23, 24. Rachel Smith, the woman who answered the door, attests that the police knocked "[b]etween 11:00 and 11:30 p.m." Dkt. No. 26-7 ¶ 1.

### III.  Procedural History

Plaintiffs filed this action against Defendants on September 20, 2019. Dkt. No. 1. The original named Defendants were "Christopher Chapman, David Gardner, ____ Johnson, Robert Karwacki, Brian Keebler, Michael Melton, Richard Perry, Karone

Robinson, James Stenander, George Trexler, Randy Turner, Jason Turner, and one or more John Does." Id. Defendants clarified that "_____ Johnson" should instead be Carl "Tug" Johnson, Jr.; that "Brian Keebler" is Brian "Kabler," and that "Karone Robinson" is "Korone" Robinson. Dkt. No. 8 at 1. Plaintiffs assert three claims against Defendants: a Fourth Amendment claim under 42 U.S.C. § 1983 ("Count One"), assault and battery claims under O.C.G.A. §§ 51-1-13 and 51-1-14 ("Count Two"), and false imprisonment and false arrest claims under O.C.G.A. § 51-7-20 ("Count Three"). Dkt. No. 1 at 6-8. Plaintiffs seek compensatory, general, special, and punitive damages, along with attorney's fees and costs. Id. at 8-9.

On November 9, 2020, Plaintiffs filed a Motion for Disclosure of the Identity of a Purported Informant in which they requested that the Court order Defendants to divulge the identity of their purported CI. Dkt. No. 27-1 at 1-2. The Magistrate Judge denied Plaintiffs' motion. Dkt. No. 53. Plaintiffs moved the Court to reconsider its order, dkt. no. 54, and the Court denied that motion as well, dkt. no. 56.

Also on November 9, 2020, Plaintiffs filed a motion for summary judgment, which the Court construes as a motion for partial summary judgment. Dkt. No. 26. Plaintiffs' motion addresses only their Fourth Amendment claim; they request a "judgment holding that Defendants are liable to Plaintiffs for their violation of

Plaintiffs' constitutional rights."  Id. at 1; Dkt. No. 26-1 at 14.  Defendants filed a cross motion for summary judgment on November 16, 2020, in which they request summary judgment on all of Plaintiffs' claims.  Dkt. No. 29; Dkt. No. 29-1 at 1-2.  The Court held oral argument on the motions on June 30, 2021.  Both motions have been fully briefed, dkt. nos. 38, 42, 51, 52, and are now ripe for review.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party."  FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact is "material" only if it "might affect the outcome of the suit under the governing law."  Id. (quoting Anderson, 477 U.S. at 248).  Factual disputes that are "irrelevant or unnecessary" are insufficient to survive summary judgment. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant must show the court that there is an absence of evidence to support the nonmoving

10

party's case.  See id. at 325.  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  See Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence."  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)).  Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."  Id. at 1117.  Where the nonmovant attempts to carry this burden with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I.   Plaintiffs' Motion for Summary Judgment

Plaintiffs argue that they should be granted summary judgment on their Fourth Amendment claim because Defendants violated their Fourth Amendment rights and Defendants are not entitled to

qualified immunity.[3]  The Fourth Amendment violation will be
addressed first and qualified immunity second.

### A. Fourth Amendment Violation

Plaintiffs contend Defendants violated their Fourth Amendment
rights for two reasons: first, Defendants' actions at Plaintiffs'
residence "constituted an unreasonable search and seizure because
they were taken without a search warrant," and second, the search
warrant's supporting affidavit "failed to establish probable
cause."  Dkt. No. 26-1 at 5, 7.  Because an issue of fact exists
regarding the existence of the warrant at the time of the search,
the probable cause underlying the search warrant need not be
addressed.

"It is axiomatic that the 'physical entry of the home is the
chief evil against which the wording of the Fourth Amendment is
directed.'"  Welsh v. Wisconsin, 466 U.S. 740, 748 (1984)
(quoting United States v. U.S. Dist. Ct., 407 U.S. 297, 313
(1972)).  "[A] principal protection against unnecessary intrusions
into private dwellings is the warrant requirement imposed by the
Fourth Amendment on agents of the government who seek to enter the
home for purposes of search or arrest."  Id. (citing Johnson v.

---

[3] The Court notes that during oral argument on the subject motions, Plaintiffs'
counsel admitted that, given the factual disputes regarding the warrant, this
case should go to trial.  Defendants' counsel argued that Plaintiffs' timeline
should not be believed because Defendants' evidence to the contrary is
overwhelming.  The Court explained that, unlike the videotape evidence in Scott
v. Harris, 550 U.S. 372 (2007), Defendants' video evidence here lacks clarity
and thus does not "utterly discredit[]" Plaintiffs' version of the events such
that "no reasonable jury" would believe them.  Cf. id. at 380.

United States, 333 U.S. 10, 13-14 (1948)).  In accordance with these tenets, "[i]t is 'a basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 586 (1980) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 477 (1971), holding modified on other grounds by Horton v. California, 496 U.S. 128 (1990)).  To overcome this presumption of unreasonableness, there must have been "exigent circumstances" and probable cause for the search.  Id. at 587-88.  Such exigent circumstances "are 'few in number and carefully delineated,'" and "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches."  Welsh, 466 U.S. at 749-50 (quoting U.S. Dist. Ct., 407 U.S. at 318); see also Lange v. California, 141 S. Ct. 2011, 2018 (2021) ("[T]he contours of . . . warrant exception[s] permitting home entry are 'jealously and carefully drawn,' in keeping with the 'centuries-old principle' that the 'home is entitled to special protection.'" (quoting Georgia v. Randolph, 547 U.S. 103, 109, 115 (2006))).  The Court has recognized that hot pursuit of a fleeing felon, destruction of evidence, and an ongoing fire are sufficiently exigent circumstances to justify a warrantless entry into a home.  Id. (citing  United States v. Santana, 427 U.S. 38, 42-43 (1976); Warden v. Hayden, 387 U.S. 294, 298-99 (1967); Schmerber v.

California, 384 U.S. 757, 770–71 (1966); Michigan v. Tyler, 436 U.S. 499, 509 (1978)).

Here, Defendants do not argue—and the evidence does not suggest—that exigent circumstances justifying a warrantless search of Plaintiffs' residence existed. See generally Dkt. Nos. 38, 29-1, 52. Indeed, Deputy Melton acknowledged that he knew it would be illegal to enter the home without a warrant; when asked whether he would "agree that without a warrant, it would not have been lawful to enter [Plaintiffs' residence] that night," Deputy Melton responded: "Not unless he let us in. You can't just enter somebody's house without a warrant like that." Dkt. No. 29-6 at 11. None of the circumstances in either party's version of the facts suggests that Defendants were in hot pursuit or that they were concerned evidence would be destroyed if they waited to get a search warrant. The reasonableness of Defendants' search of Plaintiffs' residence is therefore dependent on Defendants' contention that they had a search warrant *prior* to their entry. This issue of fact is certainly material: if Defendants obtained the search warrant *after* their search of Plaintiffs' residence, the search was undoubtedly unreasonable and unconstitutional; if Defendants obtained the search warrant *beforehand*, the search might have been constitutional. See Payton, 445 U.S. at 586–88.

The evidence in the record reflects several differing timelines regarding Defendants' movements on the night of January

24, 2018: Barbara Thomas, a neighbor, attests that the police entered Plaintiffs' residence at about 10:00 p.m. Dkt. No. 26-6 ¶¶ 10-11. Chance LaRoche attests that Defendants approached Plaintiffs' residence between 9:45 and 10:15 p.m. Dkt. No. 26-5 ¶¶ 3-5. Rachel Smith attests that Defendants arrived at Trailer A-3 between 11:00 and 11:30 p.m. Dkt. No. 26-7 ¶ 5. Larry estimated in a deposition that the search began at 12:00 a.m., and Parker estimated 1:00 a.m. Dkt. No. 26-2 ¶¶ 9, 10. Finally, Deputies Robinson and Melton contend that they had not yet performed the search of Plaintiffs' residence when they obtained the search warrant from Magistrate Judge Smith at 1:00 a.m., and they maintain that their search began at approximately 2:00 a.m. Dkt. No. 29-6 at 19; Dkt. No. 38-4 ¶¶ 13, 15. The return of service states yet another timeframe: execution of the search warrant at 12:30 a.m. Dkt. No. 26-4 at 28.

Depending on when Defendants performed the subject search, they might have performed a warrantless search and thereby violated Plaintiffs' constitutional rights. It is not the Court's province to make credibility determinations, and the differing accounts in this regard are numerous. This is a question for the jury to decide. A material issue of fact as to whether Defendants searched Plaintiffs' residence without a search warrant exists, and that issue of fact precludes a finding of summary judgment in

Plaintiffs' favor regarding Defendants' violation of their Fourth Amendments rights.

### B. Qualified Immunity

Plaintiffs further argue that Defendants are not entitled to qualified immunity as a matter of law. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be entitled to qualified immunity, a government official must first demonstrate that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988) (citations omitted). If a defendant satisfies this burden, then the Court must grant qualified immunity unless the plaintiff can demonstrate: (1) that the defendant's alleged actions violated a constitutional or statutory right; and (2) that such a right was clearly established. Bogle v. McClure, 332 F.3d 1347, 1355 (11th Cir. 2003). Courts have the discretion to determine which of these two prongs it will address first. See Pearson, 555 U.S. at 232; see also Williams v. Russo, 636 F. App'x 527, 532 (11th Cir. 2016).

No party disputes that Defendants were acting within the scope of their discretionary authority when they performed the search of

Plaintiffs' residence. Further, if Defendants' actions *did* violate Plaintiffs' Fourth Amendment rights, they would not be entitled to qualified immunity, because the right to not have one's home searched without a warrant absent consent or exigent circumstances is a clearly established one. At the time of the subject search, "Fourth Amendment law clearly established that the nonconsensual warrantless entry and search of a third party's home is per se unreasonable absent exigent circumstances." Bates v. Harvey, 518 F.3d 1233, 1249 (11th Cir. 2008) (citing Steagald v. United States, 451 U.S. 204 (1981)). "A reasonable law enforcement officer faced with these circumstances would have known he could not enter the home . . . without a warrant, exigent circumstances, or consent. That doing so would offend the Fourth Amendment was clearly established by the precedent . . . , including *Payton,* . . . which sets forth the law with 'obvious clarity.'" Bashir v. Rockdale Cnty., 445 F.3d 1323, 1331 (11th Cir. 2006) (citing Payton, 445 U.S. at 586). Defendants, knowing neither exigent circumstances nor consent were present, should have known that they could not enter Plaintiffs' residence without a warrant. Defendants would therefore *not* be entitled to qualified immunity if they did, in fact, perform a warrantless search in the later hours of January 24, 2018 or early hours of January 25, 2018.

Because an issue of fact exists as to whether Defendants obtained a search warrant prior to their search of Plaintiffs'

residence, Plaintiffs' partial motion for summary judgment must be **DENIED**.

## II.  Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiffs' claims.  The Fourth Amendment claim (Count One) will be addressed first, and the state law claims (Counts Two and Three) second.

### A. Fourth Amendment Claims

Defendants contend summary judgment is appropriate as to Plaintiffs' Fourth Amendment claim for four main reasons: first, Defendants had a valid warrant at the time of the search; second, Defendants' brief detention of Plaintiffs was lawful; third, Defendants did not use unreasonable force; and fourth, Defendants are entitled to qualified immunity.  Dkt. No. 29-1 at 5-11. However, for the same reasons that Plaintiffs' motion for summary judgment must be denied, so must Defendants' motion as to Plaintiffs' Fourth Amendment claim.  See supra section II.A.  There is a genuine issue of material fact as to whether Defendants obtained the search warrant prior to their search of Plaintiffs' residence, and a warrantless search under those circumstances would have violated a clearly established right.  Therefore, Defendants' motion for summary judgment on Count One must be **DENIED.**

## B. State Law Claims

Defendants also contend summary judgment is appropriate as to Plaintiffs' state law claims because Defendants are entitled to official immunity. Dkt. No. 29-1 at 14. Defendants argue that Plaintiffs cannot overcome official immunity because they cannot show their state law claims arose out of a ministerial function or that Defendants acted with malice or an intent to injure. Id. at 14–15. Plaintiffs argue that Defendants' motion for summary judgment on the state law claims should be denied because Defendants did not have a valid warrant. Dkt. No. 42 at 4. Plaintiffs do not specifically address Defendants' argument as to official immunity. See id.

In Georgia, "official immunity 'protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority.'" Mitchell v. Parker, 271 F. Supp. 3d 1364, 1381 (N.D. Ga. 2017) (quoting Teston v. Collins, 459 S.E.2d 452, 454 (1995)). However, under the Georgia Constitution,

> all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

Ga. Const. art. 1, § 2, ¶ IX(d). That is, public agents "can be sued 'if they (1) negligently perform a ministerial duty, or (2) act with actual malice or actual intent to cause injury while performing a discretionary function.'" Mitchell, 271 F. Supp. 3d at 1381 (quoting Teston, 459 S.E.2d at 454). Georgia courts "appl[y] these principles to actions brought against county officials." Selvy v. Morrison, 665 S.E.2d 401, 404 (Ga. Ct. App. 2008) (citing Gilbert v. Richardson, 452 S.E.2d 476 (Ga. 1994)). In this context, "actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." Id. at 404-05 (quoting Adams v. Hazelwood, 520 S.E.2d 896, 898 (Ga. 1999)). "A 'deliberate intention to do wrong' such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." Murphy v. Bajjani, 647 S.E.2d 54, 60 (Ga. 2007). "Actual malice does not include implied malice, or the reckless disregard for the rights and safety of others." Selvy, 665 S.E.2d at 405 (citing Murphy, 647 S.E.2d at 60). Similarly, "[t]he phrase 'actual intent to cause injury' has been defined in a tort context to mean an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." Id. (quoting Kidd v. Coates, 518 S.E.2d 124, 125 (Ga. 1999)).

Here, Plaintiffs do not dispute that Defendants were acting within their discretionary authority when they performed the search of Plaintiffs' residence.  See generally Dkt. No. 42. However, the jury question regarding whether Defendants performed a warrantless search also precludes summary judgment on Plaintiffs' state law claims.  If Defendants did, in fact, perform the search prior to obtaining the warrant—and, as would be indicated by the search warrant's issuance at 1:00 a.m. on January 25, 2018, they also withheld this fact from the Magistrate Judge who signed the warrant—then Defendants may not be entitled to official immunity.  If Defendants performed a warrantless search absent exigent circumstances or consent and then obtained a post-hoc search warrant in an effort to cover their tracks and alter the operation's timeline, a jury could find that Defendants' actions that evening constituted actual malice.  Although officers are still entitled to official immunity where, for example, they pursue a warrant based on largely uncorroborated testimony or perform an arrest that is later found not to be based on probable cause, "knowingly present[ing] perjured testimony" is certainly evidence of actual malice.  See Taylor v. Taylor, No. CV 313-069, 2015 WL 4601166, at *10–11 (S.D. Ga. July 29, 2015) (citing Marshall v. Browning, 712 S.E.2d 71 (Ga. Ct. App. 2011)), aff'd, 649 F. App'x 737 (11th Cir. 2016).  There is therefore a jury question as to whether Defendants acted with

malice such that they would not be entitled to official immunity on Plaintiffs' state law claims. This is a material question of fact that precludes summary judgment because *if* Defendants performed a warrantless search, they would not be immune from suit and may very well be liable to Plaintiffs on Counts Two and Three; however, if Defendants did *not* perform a warrantless search, they would be immune from Counts Two and Three altogether. Defendants' motion for summary judgment as to Counts Two and Three must therefore be **DENIED.**

## CONCLUSION

Accordingly, Plaintiffs' Motion for Summary Judgment, dkt. no. 26, is **DENIED**, and Defendants' Motion for Summary Judgment, dkt. no. 29, is also **DENIED.**

**SO ORDERED**, this 7th day of July, 2021.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA